## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Prysmian Cables & Systems USA, LLC | ) | |
| | ) | Civil Action No.: 3:21-cv-01641-JMC |
| | ) | |
| Prysmian, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Stephen J. Szymanski and Sterlite | ) | |
| Technologies, Inc., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### I.     INTRODUCTION

This matter is before the court on Prysmian Cables & Systems USA, LLC's ("Prysmian")

Motion for Preliminary Injunction (the "Motion") filed pursuant to Rule 65 of the Federal Rules

of Civil Procedure, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*., and the

South Carolina Trade Secrets Act ("SCTSA"), S.C. Code Ann. § 39-8-10 *et seq*. (West 2018) (ECF

No. 23.)  Prysmian seeks to enforce certain restrictive covenants between Prysmian and Defendant

Stephen Szymanski, and additionally alleges Szymanski and his current employer, Defendant

Sterlite Technologies, Inc. ("Sterlite") (collectively "Defendants"),[1] misappropriated Prysmian's

trade secrets and other confidential information.

The court has reviewed the pleadings, the testimony and exhibits presented at the hearing,

and the arguments of counsel.  For the reasons stated below, Prysmian's Motion (ECF No. 23) is

---

[1] The court notes that, as to its citations in this Order, "ECF No." refers to a filing on the court's electronic docket; "Hrg. Tr." refers to the uncertified hearing transcript; "Pl. Ex." refers to the specified hearing exhibit of Prysmian; and "Def. Ex." refers to the specified hearing exhibit of Defendants.

1

**GRANTED IN PART** and **DENIED IN PART**.

## II.    JURISDICTION

1.    The court has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a) because it is undisputed that the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  (ECF No. 1 at 1-2; ECF No. 11 at 1.)

2.    Prysmian is a Delaware corporation headquartered in Highland Heights, Kentucky. Defendant Szymanski is a citizen of South Carolina, and Defendant Sterlite is a South Carolina Corporation headquartered in Columbia, South Carolina.  (ECF No. 1 at 1.)  The court has personal jurisdiction over the parties, and venue is proper under 28 U.S.C. § 1391(b)(2) because the events which gave rise to Prysmian's claims took place in this judicial district.  (*Id*. at 2.)

3.    In addition, the court has federal question jurisdiction under 28 U.S.C. § 1331 over Prysmian's claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and supplemental jurisdiction under 28 U.S.C. § 1367 over Prysmian's remaining claims which arise from a common nucleus of operative fact: the breach of Szymanski's Confidentiality, Non-Competition, and Non-Solicitation Agreement with Prysmian (the "Agreement") between Defendant Szymanski and Prysmian and misappropriation of trade secrets by Defendant Szymanski and Defendant Sterlite from Szymanski's former employer, Prysmian.  (*Id*. at 1); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## III.    PROCEDURAL HISTORY

1.    Prysmian filed a Complaint against Szymanski and Sterlite on June 2, 2021, seeking injunctive relief from the alleged breach of certain restrictive covenants ("Restrictive Covenants") within the Agreement (ECF No. 1) and the misappropriation of certain trade secrets,

and alleging four claims against Szymanski:

> (1) material breaches of restrictive covenants within the Agreement;
>
> (2) actual or threatened misappropriation of trade secrets under the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-20, *et seq*. and the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.;
>
> (3) intentional tortious interference with prospective contractual relations; and
>
> (4) unfair competition;

as well as three claims against Sterlite:

> (1) intentional tortious interference with contractual relations for its alleged interference with the Agreement between Szymanski and Prysmian;
>
> (2) intentional tortious interference with prospective contractual relations between Prysmian and its customers and prospective customers; and
>
> (3) actual or threatened misappropriation of trade secrets under the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-20, *et seq*. and the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

(ECF No. 1 at 7-15.)

2.    Prysmian filed a Motion for Preliminary Injunction on September 9, 2021, (ECF No. 23), seeking injunctive relief under Fed. R. Civ. P. 65.

3.    Defendants filed their Response on October 1, 2021.  (ECF No. 26.)

4.    Thereafter, the court conducted a preliminary injunction hearing on October 25, 2021, and October 26, 2021.

5.    The court heard live testimony from seven (7) witnesses (ECF Nos. 43, 44, 45):

> **Prysmian's witnesses**
>
> a. **Stephen Szymanski**, Head of Telecommunications in the Americas Region, Sterlite.  (Hrg. Tr., Szymanski, at 23-243)
>
> b. **Massimo Battaini,** Chief Executive Officer and President, Prysmian.  (Hrg. Tr., Battaini, at 249-314.)

   c. **Christina Trainor**, North America Director of Head Office and Business Units.  (Hrg. Tr., Trainor, at 314-336.)

   d. **Danielle Rodenkirch**, North America Telecommunications Commercial Operations Director, Prysmian.  (Hrg. Tr., Rodenkirch, at 338-366.)

   e. **Pat Jacobi**, Senior Vice President for North America Telecommunications, Prysmian.  (Hrg. Tr., Jacobi, at 367-396.)

   **Defendants' witnesses:**

   f. **Steven Beasley**, Plant Head, Sterlite.  (Hrg. Tr., Beasley, at 367-417.)

   g. **Daniel Romer**, North America Sales Director, Sterlite.  (Hrg. Tr., Romer, at 417-481.)

6. The parties addressed two material issues in their pleadings and at the hearing that are relevant to this Motion: (1) the terms and enforceability of the Agreement, and (2) Prysmian's claim that it possessed trade secrets that Szymanski and Sterlite misappropriated.

7. After reviewing the testimony, carefully considering all evidence, weighing the credibility of the witnesses, evaluating the exhibits, and studying the applicable law, the court makes the following Findings of Fact and Conclusions of Law.  To the extent any Findings of Fact constitute Conclusions of Law, they are adopted as such; to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## IV. FINDINGS OF FACT

### A.  The Parties

1. Prysmian is a multinational telecommunications company headquartered in Milan, Italy, which manufactures and sells fiber optic cables, and is organized under the laws of Delaware with its principal place of business in Kentucky.  (ECF No. 1 at 1-2; ECF No. 23 at 3.) Prysmian also produces, among other things, loose tube fiber optic cable.  It has facilities throughout the world, including a plant in Claremont, North Carolina that produces loose tube

4

fiber optic cable.[2]  Prysmian does business in all of North America.  (Hrg. Tr., Szymanski, at 25:14-16.)

2.      Sterlite is a publicly traded telecommunications company headquartered in India (Hrg. Tr., Szymanski, at 115:12-13.)  Sterlite sells fiber optic products in the North American market, (ECF No. 23-8 at 1), and is valued at approximately 1.5 billion dollars (Hrg. Tr., Szymanski, at 115:14-15.)  Prysmian and Sterlite are direct competitors in selling fiber optic cable. (Hrg. Tr., Szymanski, at 26:24-27:1.)

3.      Szymanski is the global head of telecommunications for the Americas at Sterlite. He has been employed in the fiber optic cable business for nearly thirty (30) years.  (Hrg. Tr., Szymanski, at 46:9-11.)  By the time he resigned, Szymanski ran Prysmian's North American telecommunications business,  (Hrg. Tr., Szymanski, at 25:9-13), worth approximately half a billion-dollars (Hrg. Tr., Szymanski, at 25:17-18).  He has enjoyed considerable professional success in this business and is a recognized leader in the industry.

4.      Szymanski sought to leave Prysmian in the summer of 2020 and began communicating with Sterlite.  Ultimately, in late August 2020, Szymanski resigned from Prysmian and immediately began working for Sterlite.  With Szymanski's guidance, Sterlite is currently opening a manufacturing plant in Kershaw County, South Carolina, that will produce loose tube fiber optic cable.  (ECF No. 26 at 7 n.3; Hrg. Tr., Szymanski, at 138:4-8.)

5.      On June 18, 2021, approximately ten (10) months after Szymanski left Prysmian, Prysmian filed this action accusing Szymanski and Sterlite, *inter alia*, of misappropriating its trade secrets and violating the Restrictive Covenants in the Agreement.

---

[2] "Loose tube fiber optic cable" is widely produced by all major manufacturers in the fiber optic cable industry.  It contains multiple strands of fiber in a single jacket.

### B. **Szymanski's Role at Prysmian**

6.      Over the course of a nearly thirty (30) year career, Defendant Szymanski established himself as a leader in the telecommunications, broadband, and fiber optic connectivity industry.  (ECF No. 26-12 at 2.)  He was employed by Prysmian for over fifteen (15) years, eventually taking on the role of Senior Vice President, where he was responsible for Prysmian's North American Telecommunications business.  (ECF No. 23-8 at 3.)

7.      As part of his role, Szymanski had access to financial information, including profit-and-loss ("P&L") forecasts, sales forecasts, budgeting, product innovations, and supply chain and manufacturing.  (*Id*.; *see also* ECF No. 23-2 at 84-85.)  Szymanski also managed customer relationships and was familiar with the identities of Prysmian's clients, their contracts with Prysmian, including pricing and renewal dates, and their contact information.  (*Id*. at 3-4; Hrg. Tr., Szymanski 83:2-11, 84:5-6, 85:6-9.)

8.      Like in many industries, customer relationships are valuable in the optical fiber business.  (Hrg. Tr., Szymanski, at 98:10-12.)  Customer contracts tend to be long-term, often spanning multiple years.  (Hrg. Tr., Jacobi, at 377:8-25.)

9.      Pricing decisions are important in making sales in the telecommunications business.  (Hrg. Tr., Szymanski, at 84:10-18; Rodenkirch, at 365:24-25.)  Pricing is not uniform and can change from customer to customer.  (Hrg. Tr., Battaini, at 298:23-25; Jacobi, at 379:1-9; Romer, at 453:3-8.)  There is not one set market price.  (Hrg. Tr., Jacobi, at 379:1-2.)  Prysmian has fixed-price contracts with some customers spanning multiple years.  (Hrg. Tr., Jacobi, at 377:2-12.)

10.      Szymanski had pricing authority at Prysmian (and now while employed at Sterlite).  (Hrg. Tr., Szymanski, at 84:7-9, 366:1-3.)  He does not dispute that customer prices were

considered confidential at Prysmian. (Hrg. Tr., Szymanski, at 76:1-77:9.)

11.    More generally, Szymanski worked with other information considered confidential at Prysmian, including business plans, projects, estimates, costing, customer lists, technology, and technical data. (Hrg. Tr., Szymanski, at 76:1-77:9.)

12.    Szymanski earned $207,581.16 in total compensation in 2017 from Prysmian. (Hrg. Tr., Pl. Ex. 25 at p. 1.) Szymanski's base pay was $181,000 in 2017. (Hrg. Tr., Szymanski, at 134:7-8, Pl. Ex. 38 at 2.)

13.    Szymanski earned $1,027,622.64 in total compensation in 2018 from Prysmian. (Hrg. Tr., Pl. Ex. 25 at 2.) Szymanski's base pay increased by $49,000, to $230,000 in 2018. (Hrg. Tr., Szymanski, at 134:9-11, Pl. Ex. 38 at 3.)

14.    Szymanski also received two $36,000 payments under the Agreement. (Hrg. Tr., Szymanski, at 134:12-14, 231:21-24.) The third $36,000 payment was due on September 15, 2020. (Hrg. Tr., Szymanski, at 134:15-17.) By this time, Szymanski had already left Prysmian and was employed with Sterlite. (Hrg. Tr., Szymanski, at 134:12-14, 231:25-232:3.) Szymanski did not receive the third $36,000 payment. (Hrg. Tr., Szymanski, at 134:18-20.)

**C. The Agreement**

15.    Szymanski signed the Agreement with Prysmian on September 15, 2017.

16.    The Agreement includes the following material terms and Restrictive Covenants:

- It defines "Proprietary Information/Trade Secrets" as "all information, whether or not in writing, memorized, or verbally communicated, of a private, secret, or confidential nature concerning the Company's business or financial affairs."

- It also provides that Szymanski "will not use, access, or disclose any Proprietary Information/Trade Secrets for any unauthorized purposes during Your employment with the Company. You further agree that You will not use, access, retain, or disclose any Proprietary Information/Trade Secrets after separation of your employment from the Company for any reason without prior written approval of

the Company's Chief You [sic] Officer." (***Paragraph 1(A)(1), Restrictive Covenant***).

- The Agreement indicates "by way of illustration, but not limitation" that "Proprietary Information/Trade Secrets includes information that has or could have commercial value or other utility in the business in which the Company is engaged. This includes but is not limited to designs, compilations, . . . , projects, developments, marketing plans, business plans, . . . , unpublished financial data, research data, . . . , account information, including contact information for accounts, customer lists, potential customer lists, customer requirements . . . . You agree that account and customer information is not generally known or publicly available and that You gained that information only because of Your work for the Company.

- It defines "Confidential Information" as "all information, whether or not in writing, of a private, secret, legally privileged or confidential nature concerning the Company's business or financial affairs that does not constitute Proprietary Information/Trade Secrets of the Company, but is rather otherwise confidential to the Company." It also provides that Szymanski "will not disclose any Confidential Information to others outside the Company or those within the Company who have no need for such Confidential Information, or use the same for any unauthorized purposes, without written approval by the President or Corporate Secretary of the Company during Your employment with the Company, unless and until such Confidential Information has become public knowledge without fault by You." (***Paragraph 1(B)(1), Restrictive Covenant***).

- It seeks to prevent Szymanski from providing the "same or substantially same services" to a "Competitive Business" within the "Restricted Territory." The "Restricted Territory" is defined as "any location in the United States where (1) You performed services for the Company of its affiliates or had contact with the Company's accounts or customers; or (2) where the Company or its affiliates is actively manufacturing, marketing, selling, or distributing its products within the final two (2) years of Your employment, or places where the Company has made affirmative steps to manufacture, market, sell, or distribute its products within the final six (6) months of Your employment…" (***Paragraph 1(C)(2)(a), Restrictive Covenant***).

- It seeks to prevent Szymanski from soliciting "any of the Company's[] customers with whom You had business contact during the course of Your employment with the Company for any Competitive Business for the purpose of providing the same or substantially the same products or services as those provided by the Company. Further, during the same period [24 months], You will not induce or encourage any customers or accounts to cease doing business with the Company or materially alter their relationship with the Company[.]" (***Paragraph 1(C)(3), Restrictive Covenant***).

- It seeks to prevent Szymanski during the same period from soliciting "any of the Company's prospective customers or accounts with whom You had business contact during the course of Your employment with the Company for any Competitive Business[.]" (***Paragraph 1(C)(4), Restrictive Covenant***).

- It seeks to prevent Szymanski during the same period from soliciting "any of the Company's employees to leave the Company to provide services for any Competitive Business[.]" (***Paragraph 1(C)(5), Restrictive Covenant***).

17.    In addition, Prysmian made the following commitments to Szymanski in the Restrictive Covenant in at least two ways:

- The agreement provides that Szymanski "acknowledge[s] that You have received sufficient and adequate consideration for signing this Agreement, in the form of a pay raise from $60,000 to $100,000. *You acknowledge that You would not otherwise have been entitled to this consideration but for your executing and honoring this Agreement."* (***Paragraph 2(2), Restrictive Covenant***) (emphasis added).

- The Agreement also states that Szymanski would receive "consideration for this agreement" in the form of three payments of $36,000, payable respectively on September 15, 2018, September 15, 2019, and September 15, 2020. (***Paragraph 1(C)(2), Restrictive Covenant***).

18.    Finally, the Restrictive Covenant provides that "[e]ach of the time periods described in this Agreement shall be automatically extended by any length of time during which You are in breach of the corresponding covenant contained herein. The provisions of this Agreement shall continue in full force and effect throughout the duration of the extended periods." (***Paragraph 5, Restrictive Covenant***).

19.    As set forth in its Motion, Prysmian argues that Szymanski remains in breach of the Agreement, and the "extended period" should last 24 months beyond the date of this order. (ECF No. 23-8 at 5.)

20.    By contrast, Defendants contend Prysmian breached the Agreement first when it refused to raise Szymanski's base salary by an amount between $60,000 to $100,000 as stated in

the Agreement and when it failed to make the last $36,000 payment due to Szymanski on September 15, 2020.

21.    Because "the [A]greement does not condition the third payment of the $36,000 in consideration on continued employment," Defendants contend Szymanski's departure was immaterial and Prysmian's failure to make the final payment constituted a breach of its obligations under the Agreement.  (ECF No. 26 at 6.)  By contrast, Prysmian contends it was not obligated to make the final payment because Szymanski "had already breached the agreement by joining [Sterlite], a direct competitor."  (ECF No. 23-8 at 5.)

22.    Prysmian argues that since the start of his employment at Sterlite, Szymanski has breached the Restrictive Covenants in the Agreement in multiple ways.

23.    Specifically, Prysmian argues Szymanski "is actively relying on his knowledge and experience from working at Prysmian for 15 years." (ECF No. 23-8 at 9.)

24.    Further, Prysmian contends Szymanski "solicits Prysmian's customers," (*id*. at 10) and develops relationships with high level executives in Prysmian's customer base for the benefit of Sterlite.  (Hrg. Tr., Szymanski, at 99:18-100:1.)  Szymanski admits he contacted Prysmian customers while employed at Sterlite.  (Hrg. Tr., Szymanski, at 138:19-21.)  While Prysmian has alleged that it may have lost customers and business to Sterlite in the North American fiber optic cable market since Szymanski's departure, it has not produced clear evidence that it lost business, (Hrg. Tr., Szymanski, at 295-296, 394-395), or that Szymanski drew any Prysmian business to Sterlite.[3]

---

[3] Indeed, two of Prysmian's witnesses – Danielle Rodenkirch and Pat Jacobi – confirmed that Prysmian is producing its fiber optic cable at full capacity and cannot meet its customer demand. Rodenkirch specifically stated that "no one" can meet the demand of its customers and agreed that Prysmian was "selling all the cable in North America that it can produce."  (Hrg. Tr., Szymanski, at 359, 394).

25.    In addition, Prysmian argues Szymanski manages and directs Sterlite employees in selling to Prysmian's customers, thereby breaching the non-solicitation covenants in the Agreement.  Prysmian accuses Sterlite of incentivizing Szymanski's conduct through its Sales Incentive Scheme.  (ECF No. 23-8 at 10.)

26.    Finally, it is uncontested that some former Prysmian employees were offered jobs at Sterlite.  (*Id*. at 10-11.)  For instance, Szymanski confirmed Sterlite has hired two former members of his team at Prysmian: Jackie Royse and Tamitha Brown (Hrg. Tr., Szymanski, at 125:10-16; 125:23-126:3.)

**D.  Szymanski's Transition to Sterlite**

27.    Szymanski had ongoing video conferences with Sterlite in the summer of 2020. (*See* Hrg. Tr., Szymanski, at 52:16-53:3, 54:3-6, 55:17-24.)

28.    On June 10, 2020, Szymanski met for the first time, via video conference, with Sterlite executive Ankit Agarwal.  (ECF No. 23-2 at 58-59; Hrg. Tr., Szymanski, at 52:10-12, 53:7-8.)  Szymanski and Sterlite began to plan for a longer interview, and as part of the process, the CEO of Sterlite requested Szymanski provide a "strategy note" about "scaling up the North American . . . and Latin American business."  (ECF No. 23-2 at 76; (Hrg. Tr., Szymanski, at 40:20-23).)  On June 22, 2020, Szymanski sent a three-page PowerPoint presentation in response, providing "some thoughts" on Sterlite's expansion.  (*Id*.; Hrg. Tr., Pl. Ex. 8 ("[s]ee the attached"); Pl. Ex. 19.)

29.    While the parties dispute when Sterlite formally offered the position of Regional Sales Head of the Americas to Szymanski (Hrg. Tr., Szymanski, at 64:8-10; Pl. Ex. 2; Szymanski, at 65:5-7), it is undisputed that Szymanski received and negotiated a written offer from Sterlite

and "verbally accepted" the offer by email on July 24, 2020.  (Hrg. Tr., Pl. Ex. 6.)  As part of his onboarding, Szymanski signed Sterlite's offer letter, non-compete agreement, and ethics policy prior to his departure from Prysmian (ECF No. 23-8 at 8), which went into effect on August 24, 2020  (Hrg. Tr., Szymanski, at 72:16-18).

30.     In its offer letter, Sterlite told Szymanski that "[a]ll the information in your custody in whatever form which includes but is not limited to business plans, projects, estimate, costing, pricing, customers list, technology, technical data shall always be kept confidential and you shall not divulge the same in any manner whatsoever or use it for your benefit or for the benefit of any other person."  (Hrg. Tr., Pl. Ex. 4 at 10.)

31.     On July 10, 2020, the day he received a written offer from Sterlite,  (Hrg. Tr., Pl. Ex. 2; Szymanski, at 65:5-7), Szymanski emailed a PowerPoint document ("Valuation Model") to his personal email address.  (ECF No. 23-2 at 36-39; Hrg. Tr., Szymanski, at 35:3-7; Pl. Ex. 1).)  The Valuation Model contained "a business blueprint for expanding a [product] line" (ECF No. 23-2 at 39), analyzing Prysmian's margins, cash flow, costs, and working capital for the expansion of the Claremont loose tube cable plant.  (Hrg. Tr., Szymanski, at 37:24-38:2.)  The parties dispute the status of the document as a trade secret, but do not dispute the document was sent to Szymanski's personal email address.   (ECF No. 26 at 10-11; ECF No. 23-8 at 7-8.)  Prysmian contends the document contained "detailed, highly confidential information" (ECF No. 23-8 at 7), while Defendants argue the information in the document was accessible to everyone, "gleaned from public sources concerning the fiber optic cable market"  (ECF No. 26-12 at 3).  Specifically, Defendants put forth that financial metrics concerning the expansion of the Claremont plant were publicly known and discussed by Prysmian itself in earnings calls and public disclosures.  (ECF No. 26 at 8.)

32.    To support its misappropriation claim, Prysmian contends the information in the document was used to guide Sterlite's North American expansion and the construction of the Kershaw loose-tube plant. Prysmian witnesses testified that the document could harm Prysmian if placed in the hands of a competitor because it could help competitors "define the business case for their investment," and, knowing Prysmian's timing, pricing, costs and various other investment assumptions, figure out whether a North American expansion would be financially valuable and "undercut [Prysmian] with [Prysmian's] customers." (Hrg. Tr., Battaini, at 289:24-290:14; *see also* Hrg. Tr., Jacobi, at 372:18-24.)

33.    Defendants counter that there is no evidence this document was ever relayed to Sterlite. Instead, Defendants argue that Szymanski, who was working at home at this time, forwarded the Valuation Model to his home on Friday, July 10, 2020, in order to review, update, and print the document before forwarding it to Prysmian's investment committee for its meeting on July 15, 2020. (Hrg. Tr., Szymanski, at 165-168.) Szymanski also testified that he no longer has the Valuation Model, that he did not – and has not – shared any information related to the assessment with anyone outside Prysmian, and that the information contained in the Valuation Model is, in any event, obsolete. (Hrg. Tr., Szymanski, at 39, 51, 58.)

34.    Szymanski resigned from Prysmian on August 21, 2020. (ECF No. 23-2 at 3.)

35.    Sterlite is currently establishing a plant in Kershaw County, South Carolina, that will employ approximately 70 persons by February 2022. (Hrg. Tr., Beasley, at 416-417.) Sterlite hired Steven Beasley to be the plant manager following a 32-year career at another competitor, OFS. (Hrg. Tr., Beasley, at 398:21-398:20.)  Beasley testified that the plant will produce loose tube fiber optic cable, which he described as the same cable that he produced with

OFS, and that the process of manufacturing this product was "common knowledge" within the industry.  (Hrg. Tr., Beasley, at 399:5-401:12.)

36.     In August 2021, Prysmian announced its own plans to expand its Claremont plant with an $85 million investment.  (Hrg. Tr., Szymanski, at 197:24-198:11.)

## V.     CONCLUSIONS OF LAW

### A.  Preliminary Injunctions

1.     Preliminary injunctions are governed by the standard set forth in Federal Rule of Civil Procedure 65.  *See* Fed. R. Civ. P. 65; *see also Winter v. Nat. Res. Def. Council*, *Inc.*, 555 U.S. 7 (2008).

2.     A party seeking a preliminary injunction must establish all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.*; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 558 U.S. 1089 (2010).

3.     The *Winter-Real Truth* standard requires the district court to find that the party seeking the injunction has made a "clear showing" that it is likely to succeed on the merits.  *Real Truth,* 575 F.3d at 345; *see also Winter,* 555 U.S. at 22; *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545, 552 (D.S.C. 2011).  This standard compels the moving party to show that it is *likely* to prevail.  Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation.  *Compare Real Truth,* 575 F.3d at 346 *with Blackwelder,* 550 F.2d at 196; *see also Occupy Columbia*, 866 F. Supp. 2d at 552.  However, a finding of a likelihood of success on the merits is not "tantamount to [a] decision[] on the underlying merits," and courts should not "improperly equate[] 'likelihood of success' with

'success.'" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981); *see also, e.g., SCE&G Co. v. Randall*, 333 F. Supp. 3d 552, 564 (D.S.C. 2018).

4.    Second, the moving party must make a clear showing that it is likely to be irreparably harmed if preliminary relief is denied. *Winter,* 555 U.S. at 20.  The harm to be prevented must be of an immediate nature and not simply a remote possibility. *Am. Whitewater v. Tidwell*, C/A No. 8:09-cv-02665-JMC, 2010 WL 5019879, at *11 (D.S.C. Dec. 2, 2010) (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).  When analyzing the irreparable harm element, the court must make two inquiries: 1) whether the plaintiff is indeed suffering actual and imminent harm; and 2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages." *Sauer-Danfoss Co. v. Nianzhu Luo*, C/A No. 8:12-cv-3435-HMH, 2012 WL 6042831, at *1 (D.S.C. Dec. 5, 2012) (quoting *First Quality Tissue SE, LLC v. Metso Paper USA, Inc.*, C/A No. 8:11-cv-2457-TMC, 2011 WL 6122639, at *2 (D.S.C. Dec. 9, 2011)).

5.    Generally, "the possibility of permanent loss of customers to a competitor or the loss of goodwill" may indicate the existence of irreparable harm. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)).  Additionally, irreparable harm can be established by the loss of market share or price erosion, neither of which can be compensated through money damages alone. *See Z-Man Fishing Prods., Inc. v. Renosky*, 790 F. Supp. 2d 418, 4333 (D.S.C. 2011).  Similarly, "[t]he loss of a trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." *Nucor Corp. v. Bell*, C/A No. 2:06-cv-02972-DCN, 2008 WL 9894350, at *20 (D.S.C. Mar. 14,

2008) (*citing N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504-05 (5th Cir. 1982)).

6.      Third, the moving party must show that the balance of equities tips in its favor. *Winter,* 555 U.S. at 20*. See also  Uhlig, LLC v. Shirley*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).  "The doctrines that 'He who seeks equity must do equity' and that 'He who comes into equity must come with clean hands' are firmly established in South Carolina as applicable to any of the multitude of matters which may arise in equity." *Associated Spring Corp. v. Roy F. Wilson & Avnet, Inc.*, 410 F. Supp. 967, 978 (D.S.C. 1976) (citing *Mayfield v. British & Am. Mfg. Co.*, 88 S.E. 370 (S.C. 1916); *Taff v. Smith*, 103 S.E. 551 (S.C. 1920); *Shumaker v. Shumaker*, 108 S.E.2d 682 (S.C. 1959)).  This court has found that "these cases []require that the inequitable conduct by the plaintiff of which defendant complains must have occurred in connection with the transaction at issue." *Associated Spring Corp.*, 410 F. Supp. at 978.

7.      Fourth, the district court must consider whether grant or denial of the injunction is in the public interest.  The court must give "particular regard" to the public consequences of granting a preliminary injunction.  *Winter,* 555 U.S. at 23-24; *Real Truth,* 575 F.3d at 347.

8.      The Fourth Circuit no longer recognizes a "flexible interplay among the four criteria for a preliminary injunction."  *Real Truth*, 575 F.3d at 347.  Instead, each of these requirements "must be fulfilled as articulated."  *De la Fuente v. S.C. Dem. Party,* C/A No. 3:16-cv-00322-CMC, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016).  A plaintiff must first prove the first two elements before a court considers whether the balance of the equities tips in his favor. *See Real Truth*, 575 F.3d at 346-47.  Additionally, the court pays particular attention to the public consequences of employing this extraordinary form of relief via injunction.  *Real Truth*, 575 F.3d

at 347 (citing *Winter*, 555 U.S. at 24).

9.      Overall, a preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.,* 245 F.3d 335, 339 (4th Cir. 2001); *McKeown v. Pacheko*, C/A No. 1:10-cv-1606, 2011 WL 1335199, at *1 (D.S.C. Mar. 21, 2011), *report and recommendation adopted sub nom. McKeown*, C/A No. 1:10-cv-1606, 2011 WL 1321975.  The party seeking the preliminary injunction bears the burden of proving, by a preponderance of the evidence, all four elements of the preliminary injunction determination. *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 591 (E.D. Va. 2008); *Planned Parenthood S. Atl. v. Wilson*, C/A No. 3:21-cv-000508-MGL, 2021 WL 1060123, at *2 (D.S.C. Mar. 19, 2021).  "A preponderance of the evidence is evidence which convinces the fact finder as to its truth." *Id*.; *Pascoe v. Wilson*, 788 S.E.2d 686, 693 (S.C. 2016).

10.      To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages available in the normal course of litigation are not enough.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough," because of "the possibility that adequate compensatory or other corrective relief will be available at a later date."  *Hughes Network Sys. v. Interdigital Comm'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  This "weighs heavily against a claim of irreparable harm."  *Id*.  More specifically, "[a] preliminary injunction is not normally available where the harm at issue can be remedied by money damages." *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011).[4]

---

[4] The presumption against issuing preliminary injunctions where the harm suffered can be remedied by money damages at judgment stems from real concerns the issuance of a preliminary injunction remedy raises.  These concerns include, for example, the fact that in issuing a

B. **Breach of Contract**

11.      To recover for a breach of contract in South Carolina,[5] a party must prove: (1) a

binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the

contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach.

*See Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962).

12.      A breach of contract is defined as a "[v]iolation of contractual obligation by failing

to perform one's own promise, by repudiating it, or by interfering with another party's

performance."  Black's Law Dictionary 225 (10th ed. 2014).

13.      This court has previously found that under South Carolina law, "an employer who

breaches his contract cannot later enforce against an ex-employee a restrictive covenant contained

therein."  *Associated Spring Corp.*, 410 F. Supp. 967, 977 (D.S.C. 1976).  Even where the

---

preliminary injunction order, a district court is required, based on an incomplete record, to order a
party to act in a certain way.  *Hughes Network Sys., Inc.*, 17 F.3d at 694.  Issuing an injunction
further risks repetitive litigation, which carries significant costs for both parties.  *Id.*  Thus, there
are only "extraordinary circumstances" that are "quite narrow" in application, where preliminary
injunction is appropriate notwithstanding monetary damages.  *Id.* (discussing a plaintiff's business
not being able to survive as an example of such circumstances.)

[5] This action falls under the diversity jurisdiction granted to federal courts pursuant to 28 U.S.C. §
1332, and therefore the laws of South Carolina determine the standards applicable to the
interpretation of the contract at issue.  *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  The court
will apply South Carolina law when a contract dispute is brought pursuant to the court's diversity
jurisdiction.  *See Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 993 F. Supp. 2d 581, 586
(D.S.C. 2014) ("Because this action falls under the diversity jurisdiction granted to the federal
courts by 28 U.S.C. § 1332, the [c]ourt looks to the law of South Carolina to determine the
standards by which to evaluate the contract." (citing *Erie R.R. Co.*, 304 U.S. 64 (1938))).
Similarly, the laws of South Carolina apply when the court exercises supplemental jurisdiction
over the claims at issue.  A federal court sitting in diversity or supplemental jurisdiction generally
applies the relevant substantive law of the state in which the court sits, while applying federal
procedural law.  *Nat'l Quarry Servs., Inc. v. First Mercury Ins. Co., Inc.*, 372 F. Supp. 3d 296, 301
(M.D.N.C. 2019).

covenant is reasonable and "consistent with sound public policy," a court of equity should consider the "reasonableness of a covenant . . . from the nature and position of the parties and from the entirety of their dealings with each other." *Id.*  In this light "a covenant otherwise reasonable in form and scope may become unreasonable and unenforceable when enforcement is sought by a party who has breached the very contract which contains the covenant." *Id.*

14.     Covenants not to compete are strictly construed against the employer and must be narrowly drawn to protect the employer's legitimate interests. *Vessel Med., Inc. v. Elliott*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *6 (D.S.C. Sept. 15, 2015) (citing *Faces Boutique, Ltd. v. Gibbs*, 455 S.E.2d 707, 708 (S.C. Ct. App.1995)).

15.     The enforceability of such agreements "depends on whether it is necessary for the protection of the legitimate interest of the employer, is reasonably limited in its operation with respect to time and place, is not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a livelihood, is reasonable from the standpoint of sound public policy, and is supported by a valuable consideration." *Rental Uniform Serv. of Florence, Inc. v. Dudley*, 301 S.E.2d 142, 143 (S.C. 1983).

### C.  Misappropriation of Trade Secrets under the SCTSA and DTSA

16.     The SCTSA and the DTSA define "trade secret" virtually in an identical manner.

A trade secret:

(a)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

See S.C. Code Ann. § 39-8-20(5)(a) (West 2018); 18 U.S.C. § 1839(3)(B).

17.     The burden of establishing the existence of a trade secret rests on the plaintiff.  *See*

*Lowndes Prods., Inc. v. Brower*, 191 S.E.2d 761, 765 (S.C. 1972).  In order to establish the

misappropriation of a trade secret, a plaintiff must prove the following five elements:

> (1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the
> employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the
> defendant with knowledge of the breach of confidence; and (5) used by the defendant to
> the detriment of the plaintiff.

*Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 725 (D.S.C. 2007).

18.     First, the plaintiff must establish the existence of the trade secret.    A

misappropriation of a trade secrets claim requires parties to specifically identify the trade secrets

at issue.  *Carolina Chem. Equip. Co. v. Muckenfuss*, 471 S.E.2d 721, 724-25 (S.C. Ct. App. 1996).

Parties cannot extend this concept to reach "virtually all of the information [the former employee]

acquired during his employment."  *Id.*

19.     In this context, a trade secret may exist in a unique combination or compilation of

information otherwise publicly available.  *See Lowndes Products, Inc.*, 191 S.E.2d 761, 764.  *See*

*also Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, Nos. 89-1580 & 89-1588, 1991

WL 54118, at *3 (4th Cir. Apr. 15, 1991), *as amended* May 6, 1991.  However, such a compilation

trade secret must be sufficiently identified to provide reasonable details concerning the

information which makes up the secret and how that information relates together to form the

secret.  *See Decision Insights, Inc. v. Sentia Group, Inc.*, 311 Fed. Appx. 586, 594-95 (4th Cir.

2009) (dismissing certain parts of a trade secret claim for plaintiff's failure to identify the relevant

portions of source code in a computer program which corresponded to its trade secret claim).

20.     Even if some portions of a compilation of confidential information are publicly

available, it can still be considered, in its entirety, as a trade secret.  *See IHS Global Ltd. v. Trade*

*Data Monitor, LLC*, C/A No. 2:18-cv-01025-DCN, 2021 WL 2134909, at \*7 (D.S.C. May 21, 2021).

## VI.    ANALYSIS

### A.  <u>Breach of Contract</u>

### (1) Likelihood of Success on the Merits

1.     The court finds Prysmian has failed to demonstrate a likelihood of success at trial by a "clear showing" that the Agreement is enforceable. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

2.     To establish a likelihood of success on the merits on its breach of contract claim, Prysmian must present clear evidence that the Agreement was enforceable and binding upon the parties. *Fuller*, 124 S.E.2d 602, 610 (S.C. 1962).

3.     Under South Carolina Law, however, "an employer who breaches his contract cannot later enforce against an ex-employee a restrictive covenant contained therein." *Associated Spring Corp.*, 410 F. Supp. at 977.

4.     Prysmian must also present clear evidence that Szymanski breached the Agreement by failing to perform his obligations thereunder.

5.     Here, Prysmian has produced evidence which suggests Szymanski breached the Agreement because he is employed by a competitor and may have solicited Prysmian's customers and employees.   Examining the language of the Agreement, however, the court finds that Defendants established that Prysmian also violated at least one provision of the Agreement. Prysmian cannot enforce a restrictive covenant in a contract it breached and, therefore, it has not made the requisite showing that it is likely to succeed on the merits of its breach of contract claims.  Preliminary injunctive relief is thus inappropriate at this stage.

6.    In particular, the Agreement specifically obligates Prysmian to pay "sufficient and adequate consideration" to Szymanski for signing the Agreement, "in the form of a pay raise from $60,000.00 to $100,000 [*sic*]" ("Consideration Provision").  (ECF No. 1-1 at 7.)  Under the language of the Agreement, Szymanski "acknowledge[d] that [he] *would not otherwise have been entitled to this consideration but for [his] executing and honoring this Agreement.*"  (*Id.*) (emphasis added).  Defendants presented evidence that Szymanski did not receive a "pay raise" of at least $60,000 (and up to $100,000) in consideration for his signature, and to which he was otherwise not entitled.  (ECF No. 35 at 2-3.)

7.    Szymanski testified that the Consideration Provision obligates Prysmian to grant him a pay increase of least $60,000 and up to $100,000 – to which he was not otherwise entitled – and that by failing to do so, Prysmian breached the Agreement.  (Hrg. Tr., Szymanski, at 154:10-16.)

8.    Prysmian counters, however, that it fulfilled its contractual obligations, because Szymanski's base salary increased from $181,000.00 in 2017 to $230,000.00 in 2018, (Hrg. Tr., Szymanski, at 134:9-11, Pl. Ex. 38 at 3), and his total compensation increased from $207,581.16 to $1,027,662.64 (ECF No. 29 at 8).  Because Szymanski's pay was raised by more than "the compensation he was owed under the Agreement," Prysmian argues the Agreement was supported by consideration.  (*Id.*)

9.    But raw salary numbers are immaterial to the consideration at issue under *this* Agreement.  By its terms, the Consideration Provision required Prysmian to increase Szymanski's pay "from $60,000 to $100,000" for no reason other than signing the Agreement.  (ECF No. 1-1 at 7.)  It follows that any pay raise should not be attributable to stock options, performance bonuses, incentives, and other forms of compensation to which Szymanski was otherwise

entitled.

10.     Here, the court finds Szymanski provided clear evidence that (1) he did not receive the promised increase in pay and, (2) as to other compensation he received, he was otherwise entitled to it.  (ECF No. 35 at 2-3, 5, 6.)  Specifically, Defendants have put forth Szymanski's Earnings Statements between 2017 to 2019 which demonstrate the breakdown of Szymanski's total compensation between various performance bonuses, retention bonuses, and other payouts which could be attributed to sources other than consideration for signing the Agreement.[6]

11.     By contrast, Prysmian has not provided clear evidence that the requisite consideration was paid to Szymanski.  In the first instance, Szymanski's did not receive a pay raise of at least $60,000.  Prysmian's evidence simply demonstrates that Szymanski's base salary increased from $176,000 to $181,000 on September 16, 2017, the day after the Agreement was executed, (Hrg. Tr., Szymanski, at 232:4-235:15; Pl. Ex. 38 at 2), and by another $49,000, up to $230,000 in 2018.  (*Id*.)  Totaling $54,000, these raises still fall short of the $60,000 minimum pay raise required as "adequate consideration" under the Agreement.  The same reasoning applies to Szymanski's total compensation.   While the parties agree that his total pay (or "taxable income") increased from $207,581.16 in 2017 to $1,027,662.64 in 2018, Prysmian has not shown,

---

[6] Szymanski received two payments of $36,000 which were coded as "NCA" in his Earning Statements (ECF No. 35 at 5-6.)  These were part of the consideration identified within the Agreement.  The court need not consider Defendants' argument that Prysmian's failure to make the third and final $36,000 payment amounted to a breach of its obligations.  Under South Carolina law, "[a] party who seeks to recover damages for breach of a contract must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready and willing to perform it." *Mozingo & Wallace Architects, L.L.P. v. Grand*, 666 S.E.2d 267, 270 (S.C. Ct. App. 2008) (citing *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 135 (S.C. 1999).  Here, the court finds Prysmian has not shown clear evidence that it fully complied with its contractual obligations.  Therefore, it matters not whether Prysmian complied in part by timely paying two annual payments of $36,000 until Szymanski's departure.

by clear evidence, that a sufficient part of this pay raise was solely attributable to the fact that
Szymanski signed the Agreement.

12.     Prysmian's direct examination of Szymanski reveals another legal argument for the
enforceability of the Agreement, which considers, instead, the interpretation of the Consideration
Provision.  Questioning Szymanski on his salary increases during the years at issue, Prysmian
posed the following questions:

> Q:    Now let's talk about the pay raise.  You certainly were not paid
> $60,000 a year, right, at Sterlite in 2017?  You were making way
> more than that, right?
> . . .
> A:     I was making more money than the pay increase, yes.  I did not
> receive the pay increase, no.
> Q:    Well, let's look at the language of the agreement.  Let's go to Exh.
> 5. And it's at the end of paragraph 2.  It says: In the form of a pay
> raise, you acknowledge that you've received sufficient and adequate
> consideration for signing this agreement in the form of a pay raise
> from 60- to  $100,000, correct?
> A:    That's how I read it.
> Q:    And you moved -- in 2017, you had a base of $181,000?
> A:    Correct.
> Q:    And you moved to $230,000 in 2018, correct?
> A:    Correct.
> Q:    So you got a raise of more than $40,000?
> A:    I did not get a raise of $60,000, no.
> . . .
>
> Q:    My question is very simple, Mr. Szymanski. Your pay in 2017 to
> 2018 went up far more than $40,000 or even $60,000, right?
> A:    No.

13.     Reading between the lines, Prysmian's line of questioning points to a different
interpretation of the Consideration Provision.  By attempting to show that Szymanski's base
salary increased by $40,000, Prysmian appears to argue that the Agreement should be read to
guarantee Szymanski a pay raise from $60,000 in total compensation to $100,000 in total
compensation – an increase of exactly $40,000.  (*See, e.g.,* Hrg. Tr., Szymanski, at 232:13-

234:15.) However, Prysmian admits Szymanski's salary was never $60,000 nor $100,000. (ECF No. 29 at 8 ("It is also undisputed that from the time Szymanski entered the Agreement until he voluntarily resigned from Prysmian, he was always earning *well* over $100,000")) (emphasis in original). Nonetheless, this argument implies that Prysmian fulfilled its obligation by increasing Szymanski's base salary by $54,000, an amount greater than a $40,000 net change promised by the Consideration Provision.

14.    The court disagrees. All parties agree that since 2017, Szymanski never earned any salary equivalent to $60,000 or $100,000 at Prysmian. Yet, the explicit language of the Agreement refers to these amounts. Prysmian's implied interpretation that the Agreement requires a pay raise of only $40,000 would require the court to assume the existence of a typographical error in the Agreement which neither party discovered nor corrected prior to its execution.

15.    Adequate consideration is a significant and material condition of the Agreement. The plain language of the Agreement requires Szymanski to acknowledge this point. (ECF No. 1-1 at 7.) In the court's view, therefore, it is unlikely that both parties would overlook a substantial typographical error affecting a material condition of an Agreement under which tens of thousands of dollars were at stake.

16.    Moreover, South Carolina courts have held that a "contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (Ct. App. 1997) (citing 17A Am. Jur. 2d Contracts § 338, at 345 (1991)). Ambiguity is a question of law for the court. *Id.*

25

17.    The idea that an ambiguous contract is to be "construed liberally and interpreted strongly in favor of the non-drafting party" is also well-established under South Carolina law.  *S. Atl. Fin. Servs., Inc. v. Middleton*, 590 S.E.2d 27, 30 (S.C. 2003); *see also Sagittarius Sporting Goods Co., Ltd v. LG Sourcing, Inc.*, 162 F. Supp. 3d 531, 537 (D.S.C. 2016) ("There can be no dispute that a contract that is ambiguous is to be construed against the drafter.")  The court must not, however, "create an ambiguity merely by pointing out a single sentence or clause," *Sagittarius Sporting Goods Co.*, 162 F. Supp 3d at 537, and should favor an interpretation which saves the contract over one that voids it.  *Stevens Aviation, Inc. v. DynCorp Int'l LLC*, 756 S.E.2d 148, 152 (2014).

18.    While Prysmian's implied interpretation could, in this case, "save the agreement," the fact that the parties disagree about how to characterize Prysmian's payment obligations under the agreement raises concerns of gamesmanship.  Prysmian cannot, for example, rely on the contract's ambiguity and fail to pay Szymanski the stated pay raise while simultaneously attempting to enforce the full penalties of the Agreement against him.

19.    Under the well-established law of this jurisdiction, "an employer who breaches his contract cannot later enforce against an ex-employee a restrictive covenant contained therein." *Associated Spring Corp.*, 410 F. Supp. 967, 977 (D.S.C. 1976); *Laconia Clinic, Inc. v. Cullen*, 408 A.2d 412, 414 (N.H. 1979).  The court must exercise extreme caution, therefore, in determining whether Prysmian met its *own* contractual obligations before imposing contractual penalties upon Szymanski.

20.    To be sure, while Prysmian's interpretation could potentially be affirmed by a jury after the parties present evidence of their intent at the time of contracting, *see Hawkins*, 493 S.E.2d at 879, under the evidence presented in this case, a jury could also find that Defendants'

interpretation controls here.

21.    The court concludes Prysmian has not met its burden in showing, by clear evidence, that its implied interpretation of the Consideration Provision would apply.

22.    Because Prysmian has not shown, by clear evidence, the existence of a valid contract supported by consideration, the court finds Prysmian has not established that it is likely to succeed on the merits of its breach of contract claim.  At this stage, the court need not consider whether the remaining three factors for the preliminary injunction are met as to the breach of contract claim.

**B.    Tortious Interference**

23.    Under South Carolina law, the elements of a cause of action for tortious interference with contract are: (1) the existence of the contract; (2) the other party's knowledge of the contract; (3) the other party's intentional procurement of a breach of the contract; (4) the absence of justification; and (5) resulting damage.  *BCD LLC v. BMW Mfg., Co., LLC*, 360 F. App'x 428, 434 (4th Cir. 2010) (citing *Webb v. Elrod*, 418 S.E.2d 559, 561 (S.C. 1992)).

24.    Because the court finds Prysmian has not clearly shown that it fulfilled its contractual obligations under the Agreement and that it can therefore enforce the Agreement against Szymanski, Prysmian also cannot show the "existence of a contract" with which Sterlite could have interfered.  By failing to establish the first element of the tortious interference claim, Prysmian is unlikely to succeed on the merits of its tortious interference with contractual relations claim at this stage.

25.    For the reasons described above, the court need not consider whether the remaining three factors for the preliminary injunction are met as to the tortious interference claim.

**C.    Misappropriation of Trade Secrets**

**(1) Likelihood of Success on the Merits**

26.     Prysmian's trade secrets claims are independent of Szymanski's Agreement.  Thus, South Carolina and federal law impose a duty upon employees to refrain from using or disclosing trade secrets, regardless of whether they have signed a written contract.  S.C. Code Ann. § 39-8-30 (B) (West 2018) (specifically stating that the obligation to refrain from using an employer's trade secret is "independent of" any written contract); 18 U.S.C. § 1836, et seq. (nothing in the statute requires a written contract).

27.     The SCTSA and the DTSA provide this Court with express authority to issue the injunctive relief sought by Prysmian upon a showing of either actual or threatened misappropriation of its "trade secrets."   *See* S.C. Code Ann. § 39-8-50(A) (providing that "[a]ctual or threatened misappropriation may be enjoined"); 18 U.S.C. § 1836(b)(3)(A); S.C. Code Ann. § 39-8-50(C); 18 U.S.C. § 1839(b)(3)(A)(i) (authorizing the court to grant an injunction "to prevent any actual or threatened misappropriation").

28.     The availability of injunctive relief for "threatened" misappropriation of trade secrets requires no evidence of actual harm to support an injunction.  These provisions serve an important policy function in preserving the value of trade secrets, because a trade secret, once lost, is, of course, "lost forever." *See, e.g.*, *Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *9.

29.     Here, the court finds Prysmian has shown that its confidential and proprietary information constitute "trade secrets"  under both the SCTSA and DTSA definitions.

30.     First, information regarding Prysmian's finances, prices, margins, customer contracts, product strengths and weaknesses, product strategies, business plans, projects estimates, costs, pricing, customer lists, technology, and technical data is all undisputedly

confidential. All this information is protected as "trade secrets" because such information "'derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Pearl Ins. Grp., LLC v. Baker*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333, at \*4 (quoting 18 U.S.C. § 1839(3)).

31.    This Court previously has found such information to constitute a trade secret. *See, e.g., Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at \*7 (customer compilations are protected as a trade secret); *Pearl Ins. Grp.*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333 at \*4 (customer information is a trade secret); *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005) (affirming preliminary injunction related to customer list); *Uhlig LLC*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2923242, at \*5-6 (finding the following were trade secrets: "i) historical sales and ordering information; ii) cost, production and workflow information; iii) pricing and revenue information; iv) … marketing information; v) historical customer service and problem-resolution information; and vi) projection and sales prospect information").

32.    Szymanski himself acknowledges the confidentiality of Prysmian's information–going so far as to describe the Valuation Model of Prysmian's Claremont plant as "absolutely confidential." (Hrg. Tr., Pl. Ex. 1, Szymanski at 37:14-23, 38:3-16, 76:1-77:9.)  In addition, Szymanski admitted that business plans, projects, estimates, costing, pricing, customer lists, technology, technical data were all confidential at Prysmian.  (Hrg. Tr., Szymanski, at 76:1-77:9.)

33.    Moreover, Prysmian demonstrated that Sterlite, too, considers this information confidential.  Sterlite's offer letter to Szymanski, Sterlite's own non-compete agreement, and Sterlite's Code of Conduct all spell out that this information at Sterlite is, in fact, confidential.

(*See* Hrg. Tr., Szymanski, at 75:22-77:9, 77:23-78:21.)[7]  As such, Prysmian has made more than a sufficient showing that it has confidential information.

34.     Prysmian has also presented clear evidence that it took reasonable steps to protect the secrecy of its proprietary information.  (Hrg. Tr., Szymanski, at 80:17-20.)  For example, Szymanski explained that Prysmian was very careful to keep its information on its own servers. (Hrg. Tr., Szymanski, at 80:25-81:2.)  Prysmian also demonstrated that it seeks to protect its confidential information by password protecting its computers, implementing remote wipe capability, requiring password access to various systems, and limiting employees' access to information needed to know in order to do their jobs. (Hrg. Tr., Jacobi, at 375:12-21.)  Prysmian has a clean desk policy to protect its information and does training to remind employees about the importance of confidentiality. (Hrg. Tr., Jacobi, at 376:10-15.)   In addition, Prysmian presented evidence that it frequently executes nondisclosure agreements, non-competition agreements, and confidentiality agreements with its customers, suppliers and employees. (Hrg. Tr., Jacobi, at 375:22-24.)

35.     Defendants argue that Prysmian's proprietary information, such as its customer pricing, is not entitled to trade secret protection because some parts of this information, including individual price quotes, can occasionally be found in the public domain.[8]  (*See* Hrg. Tr.,

---

[7]  Additionally, Prysmian presented evidence that Defendants objected to written discovery responses on the grounds that information about customers, business plans, sales, and other comparable information is "confidential, proprietary, and may relate to Sterlite's trade secrets." (*See* ECF No. 23-7).  The court finds this hard to reconcile with Defendants' position in this case that this type of information is publicly available, and is not therefore confidential.

[8]  Defendants demonstrated, for example, that some customers shared confidential pricing information with Sterlite employees upon request.  (*See e.g.,* Hrg. Tr., Def's Ex. 41; Romer, at 444:9-12, 471:21-24).  Defendants could not show, however, that the *compilations* at issue here, including price quotes and customer lists, were available in the public domain.   Indeed, Defendants' evidence reveals the opposite: each customer price data point would need to be

Szymanski, at 167:7-8.)   But Defendants' arguments do not withstand scrutiny.   It is well established that, even though portions of proprietary information can be found in the public domain, that information is still entitled to trade secret protection—especially when the employer seeks to protect categories or compilations of data.   *See IHS Global Ltd.*, C/A No. 2:18-cv-01025-DCN, 2021 WL 2134909, at *7 (D.S.C. May 21, 2021).   Earlier this year, this court explained that "courts have found with near uniformity that lists compiling customer, pricing, product, or supplier information constitute protectable trade secrets, even where the information they contain is publicly available."   *Id.* (citing *Pearl Ins. Grp.*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333 at *4 ("plaintiff's customer lists, contact information, policy expiration/renewal dates, premium amounts, and customers' insurance business needs are all protected as 'trade secrets.'") and *Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *8 (finding "pricing and supply policies" as well as "customer lists and information" to be protectable trade secrets)).

36.     The United States Court of Appeals for the Fourth Circuit shed light on this concept by explaining that a "trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret." *Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, at *4 (4th Cir. 1991) (applying South Carolina law).

---

independently obtained from Prysmian's customers.  Most probably, this would require Sterlite employees to reach out to a wide network of Prysmian customers, obtain price information, and aggregate it in a useful compilation.  This underscores why such information is considered a trade secret in the first place: it requires competitors to expend employee effort and perform substantial competitive intelligence as opposed to simply referring to a comprehensive stolen document which neatly lays everything bare.

**(2) Irreparable Harm**

37.     The court finds Prysmian will suffer irreparable harm if Defendants are not enjoined from disclosing or using Prysmian's trade secrets in violation of the SCTSA and the DTSA.

38.     The "loss of even a single trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." *See Nucor Corp.*, C/A No. 2:06-cv-02972-DCN, 2008 WL 9894350 at *20 (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504-05 (5th Cir. 1982)).  Further, the loss of a trade secret is difficult to measure in monetary damages because once the secret is lost, it is indeed lost forever.  *See id.*  As such, even, the "threatened disclosure of a trade secret supports the imposition of injunctive relief."  *Nucor Corp.*, C/A No. 2:06-cv-02972-DCN, 2008 WL 9894350, at *20.

39.     In the case before this court, Szymanski took a Prysmian "business blueprint": the Valuation Model for the Claremont expansion.  (Hrg. Tr., Pl. Ex. 1; Szymanski, at 37:4-23.) Szymanski then began working for Sterlite and initiated plans for an analogous loose tube plant to compete with Prysmian.  (Hrg. Tr., Szymanski, at 25:17-18; Pl. Ex. 1.)  This evidence demonstrates more than a mere remote and speculative possibility of harm.  See *Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *9 (finding that in cases involving the misappropriation or threatened misappropriation of trade secrets, courts generally presume that the harm from a wrong will be irreparable and "difficult to measure in monetary damages because once the secret is lost, it is indeed lost forever").  Given Szymanski's familiarity with Prysmian's trade secrets (including customer identities, pricing, margins, costs, and investments) and the proximity of his role at Prysmian to his new position at Sterlite, the significant likelihood that

competitive confidential information may be misused is self-evident. Prysmian presented sufficient circumstantial evidence to sustain this inference.

40.     Accordingly, Prysmian has satisfied its burden of showing immediate and irreparable harm on the record before this court.

**(3) Balance of Equities and Public Interest**

41.     The court finds the balance of equities tips in Prysmian's favor, thereby warranting injunctive relief under the SCTSA and the DTSA.

42.     With respect to Prysmian's trade secrets claims, Prysmian only seeks to enjoin Defendants from using its confidential and trade secret information. Any hardship to Defendants is modest compared to the hardship Prysmian is likely to suffer if Defendant's actions are not preliminarily enjoined. *See Pearl Ins. Grp.*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333 at *5; *Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *10. In addition, the law generally presumes that the "balance of harms" favors Prysmian here, as Defendants cannot legitimately claim to be "harmed" as a result of being restrained from illegal conduct. *See Pearl Ins. Grp.*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333 at *5; *Vessel Med., Inc.*, C/A No. 6:15-cv-00330-MGL, 2015 WL 5437173, at *9-*10; *Indus. Packaging Supplies, Inc. v. Martin*, C/A No. 6:12-713-HMH, 2012 WL 1067650, at *6.

43.     The last factor meriting injunctive relief is also satisfied because the public interest favors enforcing laws protecting trade secrets and preventing unfair competition in the marketplace.

44.     Courts have recognized that trade secret protection serves the public interest and promotes fair competition. *See U.S. v. Sells Eng'g*, 463 U.S. 418, 471 (1983) (holding that injunctive relief is warranted where entry was "advancing the public interest by deterring

violations of our laws"); *Uhlig, LLC v. Shirley*, C/A No. 6:08-cv-1208-HFF, 2008 WL 3057290, *8 (D.S.C. Aug. 5, 2008) (protecting confidential information and ensuring fair competition are important public interests).

45.     Based on its review of the record, the court finds the final two preliminary injunction factors, the balance of the equities and public interest, weigh in favor of granting injunctive relief to Prysmian and against Defendants.

## VII.    BOND

1.     Rule 65 provides that "[t]he court may issue . . . a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

2.     The court "retains the discretion to set the bond amount as it sees fit or waive the security requirement" altogether. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir.1995)).

3.     In a supplemental submission requested by the court, Prysmian suggested that a nominal bond of $500 is appropriate at this stage. Defendants suggest a more substantial bond of $50,000 for any injunctive relief related to Prysmian's trade secret claims.

4.     After considering the circumstances alleged in this Motion for Preliminary Injunction and noting in particular Defendants' insistence that any confidential information in this business would be stale more than a year after Szymanski's departure from Prysmian, the court will require Prysmian to post a bond of ten thousand dollars ($10,000.00) to take advantage

of the relief granted in this Order. *See Hoechst Diafoil Co.*, 174 F.3d at 421 (acknowledging the requirement that a district court can set the bond "in such sum as the court deems proper").

## VIII.  CONCLUSION

Prysmian has met the elements of a preliminary injunction.  For the reasons stated below, Prysmian's Motion (ECF No. 23) is **GRANTED IN PART** and **DENIED IN PART**.  In particular, the court orders the following injunctive relief:

(1) Szymanski and Sterlite are preliminarily enjoined from possessing, transmitting, disclosing, using, or communicating in any matter whatsoever, either directly or indirectly, Prysmian's trade secrets and other confidential business information including, without limitation, Prysmian's confidential information regarding current and prospective customers and all related information and databases; pricing data and customer purchasing histories; customer and prospective customer contract terms including, without limitation, prices, margins, costs, customer contacts, and renewal dates; consumer data, market intelligence and strategies; vendor and supplier data; product formulations and development information including, without limitation, algorithms; proprietary development processes; and industry and product expertise;

(2) Szymanski and Sterlite are ordered to immediately preserve and return to Prysmian any and all electronic devices owned by or belonging to Prysmian, or that contain Prysmian's confidential and proprietary information including, without limitation, its trade secrets including, but not limited to, any hard drives, thumb drives, computers, laptops, cellular devices, mobile devices, and/or any other removable storage media;

(3) Szymanski and Sterlite are ordered to immediately preserve and return to Prysmian any and all physical files owned by or belonging to Prysmian, or that contain Prysmian's confidential and proprietary information including, without limitation, its trade secrets (which include, without limitation, current and prospective customers and all related information and databases; pricing data and customer purchasing histories; customer and prospective customer contract terms including, without limitation, renewal dates; consumer data, market intelligence and strategies; vendor and supplier data; product formulations and development information including, without limitation, algorithms; proprietary development processes; and industry and product expertise).

**IT IS SO ORDERED.**

United States District Judge

November 29, 2021
Columbia, South Carolina